UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
JOHN F. HUTCHINS, Individually and On
Behalf of All Others Similarly Situated,

                          MEMORANDUM AND ORDER

                      Plaintiff,

                          CV 10-2159 (LDW) (WDW)

    -against-

NBTY, INC., *et al.*,

                    Defendants.
----------------------------------------------------------X

WEXLER, District Judge

      Plaintiff John F. Hutchins brings this federal securities fraud class action against defendants NBTY, Inc. ("NBTY") and NBTY directors/officers Scott Rudolph ("Rudolph") and Harvey Kamil ("Kamil"), alleging violation of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, as well as § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Plaintiff sues individually and on behalf of all purchasers of NBTY's common stock from November 9, 2009 to April 27, 2010 (the "class period").  Defendants move to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure ("FRCP") 9(b) and 12(b)(6).  Plaintiff opposes the motion.  Upon oral argument, the Court denied the motion for the reasons below.

I.  BACKGROUND

      For present purposes, the allegations of the amended complaint can be summarized as follows.  NBTY manufactures, markets, and distributes nutritional supplements.  NBTY's common stock trades on the New York Stock Exchange.  Rudolph served as chairman of the

board and chief executive officer during the class period. Kamil served as president and chief financial officer during the class period.

NBTY conducts its business through four business segments, one of which is the Wholesale/U.S. Nutrition segment. This segment includes branded products that are marketed under various brand names and private-label brands that NBTY manufactures for many leading retailers. Before and during the class, NBTY's largest customer was Wal-Mart Stores, Inc. ("Wal-Mart"). During the class period, Wal-Mart accounted for 30% of NBTY's net sales and 80% of its private-label sales. In the fall of 2009, Wal-Mart told NBTY that, for the first time in 10 years, it would put out for competitive bids the products it had been purchasing from NBTY. Thereafter, Wal-Mart sent mass emails to suppliers of such private-label products encouraging them to bid on products previously sold to Wal-Mart by NBTY. According to plaintiff, defendants knew that NBTY would have to lower prices of products sold to Wal-Mart, or lose the business, and that the resulting pricing pressure would threaten or cause NBTY to suffer materially lower gross margins and operating results. Plaintiff alleges that defendants and the investment community were keenly focused on an adverse trend in NBTY's gross margins, as all of NBTY's growth from 2007 to 2009 was generated by its lower margin Wholesale/U.S. Nutrition segment, which had caused a downward trend in its reported gross margins. Consequently, NBTY's reported gross margins were a key metric used by investors to gauge NBTY's financial condition.

During the class period, defendants issued press releases making positive statements about NBTY's business, gross margins and future operating performance, but never told investors about Wal-Mart's competitive bidding initiative or discussed the resulting adverse

impact on NBTY's sales, pricing and future prospects.  For instance, on November 9, 2009, Kamil stated to the investing public that NBTY's reported gross margins of approximately 45% for the two most recent fiscal quarters (ending June 30, 2009 and September 30, 2009) were indicative of its ongoing performance, not the lower reported gross margins of the prior three quarters.  Kamil made this statement even though defendants – but not investors – knew that NBTY's largest customer was soliciting competing bids for products NBTY had been supplying it and that, as a result, NBTY's gross margins would be decreasing.  At the end of NBTY's December 2009 quarter, defendants purportedly assuaged investor concerns about lower gross margins for the quarter by stating that NBTY had become more efficient by improving supply chain management and employing effective controls over advertising and selling, general, and administrative costs.  Then, on March 11, 2010, a few weeks prior to the quarter ending March 31, 2010, Kamil again stated publicly that NBTY's recently reported gross margins were sustainable.  Similarly, defendants allegedly knew that NBTY would be further adversely impacted by Wal-Mart's competitive bidding initiative because NBTY would have to ramp up advertising costs associated with marketing NBTY's branded products to offset the decline in the private-label business, yet they told investors at the time that they were advertising more "efficiently."

On November 30, 2009, NBTY filed its annual 10-K form for the fiscal year ended September 30, 2009 (the "2009 Form 10-K").  The 2009 Form 10-K stated, *inter alia*, that (1) Wal-Mart accounted for 30% of NBTY's Wholesale/U.S. Nutrition net sales and 18% of company-wide net sales; (2) Wal-Mart had no commitment to purchase from NBTY; (3) NBTY had no obligation to sell to Wal-Mart; and (4) that loss of Wal-Mart, or any other major

customer, would have a material adverse effect on NBTY's operations if NBTY were unable to replace that customer. The 2009 Form 10-K did not mention Wal-Mart's competitive bidding initiative.

On April 27, 2010, defendants announced, *inter alia*, that NBTY faced increasing competition in its private-label business, that it anticipated a decrease in gross profits in the wholesale division for the remainder of 2010, and that it had spent $51 million more on television advertising in its 2010 fiscal second quarter than in the prior fiscal second quarter – a 54% increase, adversely affecting the company's net income. After analysts publicly disclosed Wal-Mart's competitive bidding initiative, NBTY's stock fell 21% on unusually heavy trading volume. In August 2010, NBTY filed its Form 10-Q for the quarter ended June 30, 2010, which reported that sales to Wal-Mart that quarter dropped "precipitously."

According to plaintiff, defendants knew that the public documents and statements issued or disseminated in NBTY's name were materially false and misleading, and that such documents and statements would be issued or disseminated to the investing public. Plaintiff alleges that a motivation for defendants' course of conduct was to allow NBTY insiders, including Rudolph and Kamil, to sell substantial amounts of NBTY common stock during the class period at prices artificially inflated by their fraud. In this respect, NBTY insiders collectively sold 1,655,063 shares of their personally-held NBTY common stock, generating proceeds in excess of $73 million during the six-month class period. Allegedly, these sales were 24 times the amount of insider sales – $3 million – in the prior 12-month period. In particular, Rudolph sold 500,000 shares, 9.4% of his holdings, in November 2009, generating $21.2 million; Kamil sold 677,713 shares, 50.9% of his holdings, in November 2009 and January 2010, generating $29.5 million.

5

Plaintiff alleges that Rudolph's and Kamil's stock sales were made pursuant to a stock trading plan established under SEC Rule 10b5-1 and NBTY policies to avoid concerns about whether insiders had material adverse inside information when they sold their stock. However, plaintiff alleges, defendants did have such information and adopted the stock trading plan to take advantage of the artificially inflated stock prices.

## II. DISCUSSION

### A. Motion to Dismiss Standard

In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), the Supreme Court held that to avoid dismissal a plaintiff is required to plead enough facts "to state a claim for relief that is plausible on its face." *Id.* at 570; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). While heightened factual pleading is not required, *Twombly* holds that a "formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. On a motion to dismiss, the court must, as always, assume that all allegations in the complaint are true and draw all inferences in favor of the nonmoving party. *Plair v. City of New York,* 789 F. Supp. 2d 459, 463 (S.D.N.Y. 2011). However, the court must ensure that the complaint sets forth "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570; *see Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 57 (2d Cir. 2010). A pleading that does nothing more than recite facts and bare legal conclusions is insufficient to "unlock the doors of discovery . . . and only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal,* 129 S. Ct. at 1950. Although a Rule 12(b)(6) motion is directed only to the sufficiency of the pleading, the court may consider written documents attached to the complaint

6

as well as documents incorporated therein by reference and those of which plaintiff had knowledge and relied upon in commencing the action. *See Brass v. Amer. Film Techn., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993).

Moreover, a complaint alleging securities fraud must satisfy the heightened pleading requirements of FRCP 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, "by stating with particularity the circumstances constituting fraud." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under the PSLRA, "the complaint must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading,' and 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Id.* (quoting 15 U.S.C. § 78u–4(b)(1), (2)); *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.* 493 F.3d 87, 99 (2d Cir. 2007) ("A securities fraud complaint based on misstatements must: (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent.").

B. Applicable Law

    1. Section 10(b) and Rule 10b-5

To prevail on a securities fraud claim under § 10(b) and Rule 10b-5, a plaintiff "must prove '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.' " *Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309, 1317 (2011) (quoting *Stoneridge*

7

*Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000); *In re Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998). Here, defendants argue that plaintiff fails to allege that defendants made material misstatements or omissions of fact and that they acted with scienter.

At the pleading stage, the materiality requirement is satisfied if a plaintiff alleges a misstatement or omission that "a reasonable investor would have considered significant in making investment decisions." *Ganino*, 228 F.3d at 161 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). As the Supreme Court has explained, " 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' " *Basic,* 485 U.S. at 231-32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "Because materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 134*, 553 F.3d at 197 (internal quotation marks omitted).

A securities fraud complaint based on omissions "is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir. 1993). Such a duty "arises when disclosure is necessary to make prior statements not misleading." *Id.* at 268.

Under the PLSRA, a plaintiff's securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

8

*Matrixx Initiatives, Inc.,* 131 S. Ct. at 1324. A complaint adequately pleads scienter " 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.' " *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S. Ct. 2549, 2499 (2007)). "The requisite scienter can be established by alleging facts to show either: (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134*, 553 F.3d at 198. Under the first prong, motive and opportunity to commit fraud is usually met where the complaint alleges facts that show the "defendants benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000). This element generally is met "when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 74 (2d. Cir. 2001). " 'Unusual' insider sales at the time of the alleged withholding of negative corporate news may permit an inference of . . . scienter." *Id.* "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stock holdings sold, the change in volume of insider sales, and the number of insiders selling." *Id.* at 74-75. Under the second prong, "the strength of the circumstantial allegations must be correspondingly greater" if there is no motive. *Kalnit v. Eichler,* 264 F.3d 131, 143 (2d Cir. 2001). To qualify as recklessness, "defendants' conduct must have been 'highly unreasonable' and 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *In re Scholastic Corp. Sec. Litig.,* 252 F.3d at 76 (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978)). "Where the

complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately plead for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *Id.*

   2. Section 20(a)

To state a claim for control person liability under § 20(a), a plaintiff must allege (1) a primary violation by a controlled person; (2) actual control by the defendant; and (3) the controlling person's culpable participation in the primary violation. *In re Bristol Meyers Squibb Co. Sec. Litig.,* 586 F. Supp. 2d 148, 170 (S.D.N.Y. Aug. 20, 2008). Thus, any claim for "control person" liability under § 20(a) must be predicated on a primary violation of securities law. *See* 15 U.S.C. § 78t(a) (imposing liability on any person who "controls any person liable" for securities fraud); *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004).

C. Analysis of Claims

   1. Violation of § 10(b) and Rule 10b-5

      a. Material Misstatement or Omission

Defendants argue that they made no misstatement or omission of material fact because NBTY met its stated gross margin projections for the class period and their projections were labeled as "best guesses" and were indicative of past quarter earnings. Defendants maintain that NBTY's 2009 Form 10-K refutes plaintiff's claim because it stated that (1) Wal-Mart bought NBTY's products on an individual basis, (2) Wal-Mart had no commitment to purchase NBTY's products, (3) NBTY had no obligation to sell Wal-Mart its products, and (4) losing Wal-Mart or any other major customer would have a material adverse effect on NBTY. Defendants further

10

maintain that they made no actionable misstatement because NBTY's statements about gross profits were "forward looking" and accompanied by "meaningful cautionary language," thereby satisfying the "bespeaks caution" doctrine and statutory "safe harbor" provision of the PSLRA. *See* 15 U.S.C. § 78u-5(c) (providing "safe harbor" for a forward-looking statement identified as such and accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) (observing that under "bespeaks caution" doctrine courts have held that meaningful cautionary language can render omissions or misrepresentations immaterial).

Plaintiff maintains that the amended complaint sufficiently alleges that defendants made misstatements or omissions of material fact. According to plaintiff, defendants' positive statements about NBTY's business, gross margins and operating leverage and profitability during the class period were misleading because the information that Wal-Mart, NBTY's then-biggest wholesale customer, was soliciting competitive bids for the first time in 10 years meant NBTY's current results were not indicative of its future performance. According to plaintiff, defendants knew that Wal-Mart's decision to solicit competitive bids meant that NBTY's operating leverage would decline materially, making defendants' statements concerning NBTY's positive financial results false and misleading for omitting any discussion of Wal-Mart's decision and its inevitable consequences. Defendants also allegedly knew that NBTY would be further adversely impacted by Wal-Mart's competitive bidding initiative because NBTY would have to ramp up advertising costs associated with marketing NBTY's branded products to offset the decline in the private-label business.

Upon consideration, the Court concludes that plaintiff sufficiently pleads with particularity material misstatements or omissions by defendants. The information relating to Wal-Mart's competitive bidding initiative, in light of statements made, was not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 134*, 553 F.3d at 197. Reasonable minds could differ on the importance to reasonable investors of the information relating to Wal-Mart in light of the information disclosed, particularly since NBTY was Wal-Mart's exclusive nutritional supplement supplier and Wal-Mart accounted for a substantial percentage of NBTY's sales. It is plausible that a reasonable investor would view NBTY's potential loss of Wal-Mart's business – or retaining it at lower prices – significant to an investment decision under the circumstances. *See Ganino,* 228 F.3d at 161. Moreover, to the extent NBTY's alleged statements were "forward looking," the Court cannot say, as a matter of law, that there was sufficiently "meaningful cautionary language" to satisfy the "bespeaks caution" doctrine and "safe harbor" provision.

  b. <u>Scienter</u>

As for scienter, plaintiff argues that (1) defendants' substantial stock sales during the class period show a motive and opportunity to commit fraud; and (2) defendants' conduct shows strong circumstantial evidence of conscious misbehavior or recklessness because defendants knew that Wal-Mart was soliciting competitive bids from other suppliers, yet did not disclose this information while making positive statements of NBTY's costs, sales, gross margins, operating leverage and profitability. Defendants argue that there was no motive and opportunity to commit fraud because their stock sales were not unusual and were made pursuant to a Rule 10b5-1 trading plan, and the Wal-Mart information was sufficiently disclosed in the 2009 Form

12

10-K, while the gross margin projections were indicated as "best guesses" and ultimately achieved.

Upon consideration, the Court concludes that plaintiff pleads with particularity facts giving rise to a strong inference that defendants acted with the required state of mind. In this respect, plaintiff sufficiently pleads "unusual" sales by NBTY insiders, particularly defendants Rudolph and Kamil, during the class period, given the substantial amounts and percentages sold during that period and as compared to the prior 12 months. Moreover, the Court finds that plaintiff sufficiently pleads strong circumstantial evidence of conscious misbehavior or recklessness by defendants, given their failure to disclose material adverse information concerning the company's largest customer and the potential resulting adverse impact on costs, sales, pricing, operating leverage and profitability, while making positive statements about costs, sales, gross margins, and operating leverage and profitability, all while engaging in substantial insider stock sales.

Thus, the Court concludes that the amended complaint sufficiently pleads a violation of § 10(b) and Rule 10b-5 against defendants.

2. Violation of § 20(a)

As for the alleged violation of § 20(a), Rudolph and Kamil do not dispute that they are "control persons." Given the Court's conclusion that the amended complaint sufficiently states a claim of primary violation under § 10(b) by Rudolph and Kamil, and given their culpable participation therein, the Court concludes that the amended complaint sufficiently pleads that Rudolph and Kamil violated § 20(a).

13

### III.  CONCLUSION

For the above reasons, defendants' motion to dismiss is denied.

SO ORDERED.

_____/s/_____
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
       March 30, 2012